[Docket Nos. 53 and 55]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| ERIC POE, | |
| Plaintiff, | Civil Action No. 1:20-cv-14586 (RMB/SAK) |
| v. | |
| DRIVER HISTORY SALES CORP., *et al.*, | OPINION |
| Defendants. | |

**RENÉE MARIE BUMB, United States District Judge**

The plaintiff, Eric Poe ("Plaintiff" or "Poe"), brings this action against several defendants, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 and alleging claims for breach of contract, fraud, aiding and abetting fraud, and tortious interference of contract. [Docket No. 31.] The defendants generally fall into one of four categories. The first category includes the entities that formerly engaged Plaintiff as a consultant, Driver History Sales Corp. ("DHIS Corp.," which is also referred to in the contracts simply as "DHIS") and Driver History Information Sales, LLC ("DHIS LLC") (collectively with DHIS Corp. and each of their past and present affiliates, "Driver History").[1] The second category of defendants includes the current parent companies of DHIS LLC:  TransUnion, LLC, TransUnion Intermediate

---

[1] "Driver History" also refers to the non-defendant affiliates of DHIS Corp. and DHIS LLC, including Drivers History Inc. ("DHI").

1

Holdings, Inc., and TransUnion (collectively, "TransUnion").[2] The third category of defendants includes Scott Nichols and Stephen Esposito, the individual founders of Driver History (together, the "Individual Defendants"). The fourth and final category of defendants consists of John and Jane Doe(s) and ABC Companies who allegedly participated in and/or aided in the alleged fraud against Poe (collectively with the defendants in each of the four categories, "Defendants").

All served Defendants in this action move to dismiss the operative complaint under Fed. R. Civ. P. 12(b)(6). [Docket Nos. 53 and 55.] Additionally, TransUnion moves to dismiss the claim against it of aiding and abetting a fraud on the basis of Fed. R. Civ. P. 9(b). Distilled to its essence, this case involves the interpretation of a specific clause in a consulting agreement entered into between Plaintiff Poe and Defendant DHIS on or about October 22, 2007 (the "Consulting Agreement"). [Docket No. 31-4.] All but one of Plaintiff's claims rise or fall depending upon the interpretation of such clause (defined herein as the "Sales Clause") in the Consulting Agreement.[3] For this reason, the Court's Opinion focuses primarily on Poe's claim for breach of contract arising under the Sales Clause contained in Section 6 of the Consulting Agreement.

---

[2] TransUnion, LLC allegedly acquired direct and indirect equity interests in DHIS LLC in November 2014.

[3] To the extent Poe alleges a breach of contract under what is referred to herein as the "Commission Clause" of the Consulting Agreement, that claim is not affected by the interpretation of the separate "Sales Clause," which concerns the sale of the company.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the First Amended Complaint and its attachments (collectively, the "FAC"). [Docket No. 31.] DHIS was a business formed to provide a novel database of driving records to insurance companies. According to Poe, the idea for this novel database was his. [Docket No. 31, at ¶ 29.]

### A.     The Consulting Agreement

On or about October 22, 2007, Plaintiff Poe and Defendant DHIS entered into the Consulting Agreement, pursuant to which Poe was to provide services to DHIS "to help procure contracts from outside insurance companies related to the sale of data relating to unofficial drivers[sic] histories." [Docket No. 31-4, at ¶ A.] The Consulting Agreement plainly provides that it is between Poe and DHIS. [*Id.*] Poe signed the Consulting Agreement in his capacity as an "Attorney at Law." [*Id.*] Individual Defendant Esposito – who is alleged to have also been a licensed attorney [Docket No. 31-3, at 2] – signed the Consulting Agreement on behalf of DHIS. [*Id.*]

Section 6 of the Consulting Agreement, which is at the heart of the within dispute, consisted of two parts. First, the so-called "Commission Clause" provided for certain commission payments to Poe. [Docket No. 31-4, at ¶ 6.] Pursuant to the Commission Clause, Poe was to receive commission payments at the applicable rate "from the clients he assists DHIS in retaining, for a period of 20 years," and the commissions would be paid to Poe "**irregardless if [Poe] is fired for good cause or not or decides to end his consulting relationship with DHIS.**" [*Id.* (emphasis

added).] In the event Poe introduced a prospective client to the company but quit or was terminated prior to the prospect signing up for services, Poe would nevertheless receive a 20-year commission payment for retaining such client so long as the prospect was signed within six months of Poe's resignation or termination of employment. [*Id.*] The Commission Clause expressly provided in-full as follows:

> **6.  Compensation**
> For the services rendered by the Consultant as required by this Agreement, the Customer will pay to the Consultant compensation based on the following scale.
>
> > A.  Consultant will be paid a 17.5% commission for the annual gross sales he makes of DHIS's products or programs up to sales of $500,000.00
> >
> > B.  Consultant will be paid a 20% commission for the annual gross sales he makes of DHIS's products or programs for sales of $500,001.00 and up.
>
> Payment for consulting services will be due and paid on a monthly basis at the end of the previous month but can be carried forward to the following month if the amount due to Consultant does not exceed $10,000. If payment is past due for more than 60 days past the date of the month end for which sales were generated Customer agrees to compensate Consultant 1% per 30 days (12% APR) in interest. Consultant's commission will be paid from the clients he assists DHIS in retaining, for a period of 20 years from the date of the contract. This commission will be paid to consultant based on the commission rate outlined in A and B above, irregardless if Consultant is fired for good cause or not or decides to end his consulting relationship with DHIS. So it is clear, if Consultant has direct contact with a company will[sic] he is in his consulting position with DHIS, and he quits or is terminated shortly thereafter, so long as Consultant was the person who introduced said company/client to DHIS, and the Contract is signed within 6 months of Consultant's termination, then consultant will be paid his agreed upon said commission as outlined above for 20 years from the date of contract, so long as the contract relates to a state in which a fully developed product has been developed and marketed.

[*Id.* (alteration omitted).]

The second part of Section 6 of the Consulting Agreement is the so-called "Sale Clause," which immediately follows the Commission Clause. [*Id.*] The Sales Clause provided that in the event DHIS was sold, Poe would receive a 15% portion of the sale proceeds "in exchange for" (i) the termination of the Consulting Agreement, and (ii) a cessation of any future-owed commission payments under the Consulting Agreement; the Sale Clause reads in-full as follows:

> Moreover, in the event DHIS is sold directly (or indirectly through a sale of DHI parent company) Consultant will receive 15% of the sales proceeds of DHIS (or allocated share of such) in exchange for a termination of this consulting agreement and Consultant agrees to forego all future revenue associated with this agreement post sale.

[Docket No. 31-4, at ¶ 6 (alteration omitted).]

## B.    First Modification of the Consulting Agreement

On March 27, 2008, the Consulting Agreement was modified for the first time with an addendum, which altered the commission rates set forth in the Commission Clause of Section 6 of the Consulting Agreement (the "First Modification Agreement"). [Docket No. 31-5.]

## C.    Termination of the Consulting Agreement

On September 25, 2009, a little under two years after the parties signed the Consulting Agreement, Individual Defendant Nichols sent a letter on DHIS Corp. letterhead to Plaintiff, pursuant to Section 3 of the Consulting Agreement,[4]

---

[4] Section 3 of the Consulting Agreement provided that "[i]n the event that either party wishes to terminate this Agreement, the party will be required to provide a notice period of 60 days." [Docket No. 31-4, at ¶ 3.]

terminating the Consulting Agreement as amended by the First Modification Agreement (the "Termination Letter"). [Docket No. 31, at ¶ 76.] The Termination Letter provided, in part, that Poe's "position as an officer of CURE Auto Insurance precludes you from performing various material services as contemplated by the [Consulting] Agreement, namely, using your industry contacts to develop client relationships for the Company." [Docket No. 55-4.] The Termination Letter further provides that "[t]he company will abide by its past termination obligations. . . in accordance with the terms of the [Consulting] Agreement." [*Id.*]

### D.   Second Modification of the Consulting Agreement

After termination of the Consulting Agreement and pursuant to the Termination Letter, Poe continued to be paid commissions by DHIS Corp., and as of the filing date of the FAC, Poe "continued and continues to be paid commissions."[5] [Docket No. 31, at ¶ 78.] On or about June 16, 2012,[6] the parties entered into a second modification of the Consulting Agreement (the "Second Modification Agreement"), which allowed for Poe to take an advance from DHIS of $120,000 in

---

[5] In Count I of the FAC, Poe seeks an accounting of his sales from all Defendants pursuant to Section 7 of the Consulting Agreement. [Docket No. 31, at ¶ 121(h).] Defendants are perplexed by the timing of Poe's request.

[6] The FAC alleges the second modification of the Consulting Agreement occurred on September 15, 2010 [Docket No. 31, ¶ 87], but the Second Modification Agreement, attached to the FAC as Exhibit F, states a date of June 16, 2012 [Docket No. 31-6, at 1].

exchange for forbearance of a larger sum of $148,800 due.[7] [Docket No. 31-6, at 1-2.]

## E.   Acquisition by TransUnion

On or about November 12, 2014, TransUnion acquired an ownership interest in DHIS LLC.  The details of that transaction and the circumstances surrounding the acquisition have been the source of bitter disagreement between the parties. Plaintiff alleges that TransUnion's acquisition of DHIS LLC was done through a series of complex and convoluted securities purchase transactions that were structured in a manner to intentionally and fraudulently deprive Poe of his right to receive a share of the sales proceeds as provided under the Sales Clause of the Consulting Agreement. In the FAC, Poe even goes so far as to allege that the formation of DHIS itself was a "sham and a lie."[8] [Docket No. 31, at ¶ 37.]

## F.   Complaint and the FAC

On October 16, 2020, Plaintiff commenced this action by filing the initial Complaint.[9] [Docket No. 1.] The FAC was filed on March 12, 2021 [Docket No.

---

[7] The FAC alleges the advance was for $100,000 [Docket No. 31, at ¶ 88], but the Second Modification Agreement provides for an advance of $120,000. [Docket No. 31-6, at ¶ 1].

[8] Poe even alleges in the FAC that "[e]very person, including the lawyers and professionals involved in these transactions was knowingly or unknowingly complicit in Mr. Nichols and Mr. Esposito's fraud." [Docket No. 31, at ¶ 100.] Putting aside the issue of whether such a sweeping accusation has any place in a pleading, the allegation is concerning.

[9] Why Plaintiff waited almost six years to commence his lawsuit—when he alleges he was at least aware that TransUnion had "purchased a majority interest in 'Driver History'" in December 2014—remains unclear. [Docket No. 31, at ¶ 95.]

30], and a corrected version was filed on March 14, 2021. [Docket No. 31.] In relevant part, Poe alleges a breach of contract claim against Defendants, asserting a right to 15% of the sale proceeds from the 2014 TransUnion acquisition.

### G.    Motions to Dismiss

The Individual Defendants filed a motion to dismiss on May 14, 2021. [Docket No. 53.] TransUnion and Driver History filed a separate motion to dismiss on the same day. [Docket No. 55.] Poe filed a brief in opposition to both motions on June 18, 2021. [Docket No. 56.] The Defendants filed their respective reply briefs on July 9, 2021. [Docket Nos. 59 and 60.]

Upon strong encouragement by this Court and in an effort to avoid or streamline the anticipated motions to dismiss, Defendants provided a detailed explanation to Poe regarding their corporate structures and the TransUnion acquisition. [Docket No. 31, at ¶¶ 3-7.] Unfortunately, the Court's efforts backfired. Poe now accuses Defendants of submitting a "bizarre" letter "that made matters even more confusing." [*Id.* at ¶ 6.] In a nutshell, Defendants, through counsel, explained the following to Poe in their letter dated March 2, 2021:

> Drivers History Inc. ("DHI"), a New Jersey corporation, was incorporated in New Jersey on December 22, 2006. Prior to entering into the Consulting Agreement with Poe, the principals of DHI recognized and discussed with Mr. Poe the necessity of separately accounting for any customers for which Mr. Poe would earn commissions based on his introduction of the customer and all other DHI business for which he would not. The parties agreed that customers and business generated by Mr. Poe would be tracked on a separate profit and loss report, called Driver History Sales Corp. or "DHIS" within the accounting system of DHI. This was done to ensure that Mr. Poe's commissions could be accurately tracked. . . .

8

The counterparty identified in the Consulting Agreement was "Driver History Sales Corp." or "DHIS." This is consistent with the parties discussions referenced above that DHIS was merely a branch or division of DHI for accounting purposes. . . .

From the inception of the Consulting Agreement Mr. Poe was clearly aware that he had contracted with DHI. In addition to the express conversations which occurred prior to the execution of the Consulting Agreement, all transactions in which Mr. Poe was involved referenced and involved DHI, not DHIS. All customers that Mr. Poe brought to the company and for which he received credit, signed contracts with DHI. Mr. Poe even assisted in drafting the standard contract used by DHI and participated in all of the negotiations for contracts in which he was responsible. Those contracts clearly indicated the contracting party as DHI. Most importantly, from the inception of the consulting agreement through August 2012, Mr. Poe was paid his commissions by DHI on checks drawn on a DHI bank account.

On August 12, 2009, Drivers History Information Sales, LLC ("DHIS LLC") was formed as a New Jersey Limited Liability Company and a subsidiary of DHI. In August 2012, pursuant to a Security Exchange Agreement, a Contribution, Assignment and Assumption Agreement and various related agreements, all of the assets, stock and liabilities of DHI were transferred to DHIS LLC. As of August 3, 2012, the members of DHIS LLC were Court Services, Inc. and DHIS Partners LLC. In May 2013, Court Services, Inc. contributed its membership interest in DHIS LLC to DHIS Investments LLC. David McGough subsequently purchased an 11.5% interest in DHIS Investments LLC.

After the transfer of assets and liabilities from DHI to DHIS LLC, beginning in September 2012 and continuing thereafter, all payments to Mr. Poe related to the Consulting Agreement were paid by DHIS LLC on checks drawn on a bank account of DHIS LLC. . . .

. . . TransUnion purchased an interest in DHIS LLC in November 2014 through acquiring an interest in DHIS Investments LLC and DHIS Partners LLC. Subsequent to the November 2014 transaction, it is believed that Mr. Poe continued to receive commission payments under the Consulting Agreement from DHIS LLC consistent with its acquisition of the assets and liabilities of DHI in August 2012.

[Docket No. 31-2, at 1-2.]

## II.    JURISDICTION

The Court exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. Plaintiff is a citizen of Pennsylvania. Individual Defendants are citizens of Utah and New Jersey who are alleged to have formed Defendant DHIS for the purpose of defrauding Poe. TransUnion has a principal place of business in Illinois of which DHIS LLC is a wholly-owned subsidiary. [Docket No. 31, at ¶ 15.]

## III.    LEGAL STANDARD

When considering a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). It is well-settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted) (first citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957); then citing *Sanjuan v. Am. Bd. of*

*Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994); and then citing *Papasan*

*v. Allain*, 478 U.S. 265, 286 (1986)).

> To determine the sufficiency of a complaint, a court must take three
> steps. First, the court must "tak[e] note of the elements a plaintiff must
> plead to state a claim." Second, the court should identify allegations
> that, "because they are no more than conclusions, are not entitled to the
> assumption of truth." Third, "whe[n] there are well-pleaded factual
> allegations, a court should assume their veracity and then determine
> whether they plausibly give rise to an entitlement for relief."

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (alterations in original) (citations

omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 675, 679 (2009)). A court may

"generally consider only the allegations contained in the complaint, exhibits attached

to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249

(3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d

1192, 1196 (3d Cir. 1993)). In this regard, the Court relies, in significant part, on the

relevant provisions of the Consulting Agreement and the other exhibits attached to

the FAC.

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff

will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claim." *Twombly*, 550 U.S. at 563 n.8 (quoting *Scheuer v. Rhodes*, 416 U.S.

232, 236 (1974)); *see also Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded

the pleading standard for 'all civil actions' . . . ."); *Fowler v. UPMC Shadyside*, 578

F.3d 203, 210 (3d Cir. 2009) ("*Iqbal* . . . provides the final nail in the coffin for the 'no

set of facts' standard that applied to federal complaints before *Twombly*."). "A

11

motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" *Malleus*, 641 F.3d at 563 (quoting *Twombly*, 550 U.S. at 570).

## IV.   ANALYSIS

The Court now turns to Defendants' pending motions to dismiss.

### A.   The Parties' Arguments

As discussed above, Poe now argues that he was the victim of a fraudulent scheme, the purpose of which was to allegedly deprive him of his right to receive 15% of the sales proceeds of Driver History pursuant to the Sale Clause contained in Section 6 of the Consulting Agreement. Plaintiff alleges this right was automatically triggered when TransUnion acquired DHIS LLC for $43.8 million. He argues that years before the sale, Individual Defendants Nichols and Esposito used DHIS as a "fake company" to enter into the Consulting Agreement with Poe for the purpose of defrauding him years later in 2014 with the sale of another entity, DHIS LLC, which Poe alleges was secretly formed and to which DHIS transferred all of its assets. [Docket No. 31, at ¶¶ 65-74, 94-104.] In sum, Poe alleges, that by crafting a convoluted series of fictitious entities, Defendants deprived him of approximately $6,570,000 (*i.e.,* 15% of the sale of DHIS, which is alleged to be for "at least $43.8 million"). [*Id.* at ¶ 94.] Plaintiff also argues that TransUnion turned a blind eye to these fraudulent contracts when it acquired DHIS LLC. Specifically, Poe alleges the Defendants used shell companies and convoluted securities agreements to avoid paying him.

Defendants argue that this Court need not get bogged down in Plaintiff's convoluted conspiracy theories. Defendants concede <u>for purposes of their motion only</u> that DHIS LLC (the entity Poe alleges was formed in secret) and the TransUnion Defendants (the alleged knowing or willfully blind conspiring parties to the fraud) succeeded to the legal obligations of DHIS, the employer-entity that was party to the Consulting Agreement with Poe. [Docket No. 55-1, at 9.] Defendants argue that regardless of who the contracting party actually is with respect to the Consulting Agreement, Poe is still owed nothing under the Sales Clause because at the time of the sale, his services had already been terminated. In other words, the Consulting Agreement had already been terminated and, therefore, could not be terminated when the sale actually occurred "in exchange for" Poe's receipt of the sales proceeds as required by the language of the Sales Clause.

Further, as to Count I (for Declaratory Judgment) and Count II (Breach of Contract) of the Amended Complaint, TransUnion argues that even if the Sales Clause gave rise to a payment obligation, it is not legally enforceable as to TransUnion because neither it nor DHIS LLC were signatories to the contracts at issue nor did they receive any proceeds from the sale. [Docket No. 55-1, at 21-23.] The Amended Complaint concedes as much. As to the remaining claims—Count III (fraud against Individual Defendants Esposito and Nichols), Count IV (aiding and abetting fraud against the TransUnion Defendants), and Count V (tortious interference with contract against the TransUnion Defendants)—all Defendants argue such claims must be dismissed because, *inter alia*, they fail to plead with

particularity and because any fraud claim is time-barred or barred by the doctrine of economic loss. [Docket Nos. 53-1, at 24-28; 55-1, at 27.] The Individual Defendants also allege that Count II must be dismissed because they are not parties to the contracts at issue. To the extent Poe seeks unpaid commissions, they argue, he has failed to plead specific facts.

### B.    The Court's Findings

As an initial matter, Defendants DHIS LLC and the Trans Union Defendants accept as true the allegations that DHIS LLC has succeeded to the legal obligations of Driver History Sales Corp. and Drivers History Inc. [Docket No. 55-1, at 9.] The Court appreciates the wisdom of this conditional concession: if Poe's claim that he is entitled to the 15% sales proceeds under the Consulting Agreement is deficient and there has been no breach of contract, then any claims based on fraud as they relate to the 15% sales proceeds under the Consulting Agreement necessarily fail. Because the Court agrees that the case essentially rises or falls based on the interpretation of the Sales Clause in Section 6 of the Consulting Agreement, the Court turns its focus to the exact contractual language:

> Moreover, in the event DHIS is sold directly (or indirectly through a sale of DHI parent company) Consultant will receive 15% of the sales proceeds of DHIS (or allocated share of such) in exchange for a termination of this consulting agreement and Consultant agrees to forego all future revenue associated with this agreement post sale.

[Docket No. 31-4, at ¶ 6.]

It is well-settled that a breach of contract claim requires the plaintiff to show four elements:  (1) the existence of a valid contract between the parties; (2) the

defendant materially breached the contract; (3) the plaintiff suffered damages as a result of the defendant's breach; and (4) the party stating the claim satisfied its own contractual obligations. *See Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). When interpreting contracts, courts must "examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." *State Troopers Fraternal Ass'n of New Jersey, Inc. v. State*, 692 A.2d 519, 523 (N.J. 1997). "Contracts should be read as a whole in a fair and commonsense manner." *Manahawkin Convalescent v. O'Neill*, 85 A.3d 947, 958 (N.J. 2014) (citation omitted) (alteration omitted). "If the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect." *Id.* at 958-59 (alteration omitted).

The first question then is whether the contract is unambiguous on its face. Defendants contend that it is. Defendants aver that nothing in the Consulting Agreement indicates that the parties intended the 15% obligation to survive termination of the Consulting Agreement itself. Defendants rely upon the language "in exchange for a termination of this consulting agreement" in the Sales Clause. This language, they argue, demonstrates plainly that the 15% payment upon a sale of the company is effective <u>only if</u> the agreement has not previously been terminated. Because the Consulting Agreement was previously terminated, Defendants aver that Poe's entitlement to sales proceeds flowing from any subsequent sale of the company was likewise terminated.

To emphasize their plain language interpretation, Defendants illustrate the parties' precision in drafting other provisions of the Consulting Agreement that plainly survive termination of the Agreement, citing to Section 8 (Confidentiality), Section 9 (Non-Competition), and the Commission Clause in Section 6. The separate Sales Clause in Section 6 of the Consulting Agreement, however, is not one of the provisions containing clear survival language. Defendants argue, under the maxim of *expressio unis est exclusion alterius*, where an agreement specifies that an obligation or remedy survives termination of an agreement, only such specified obligation or remedy survives and the survival of any other provision may not be implied.

Poe pooh poohs Defendants' plain language argument as not a "serious" one. [Docket No. 56, at 23.] Yet, the Court is convinced that it is. The language in the Sales Clause provides that "in the event DHIS is sold" – a fact Defendants concede for purposes of this motion – two of Poe's covenants must also occur for Poe to receive the 15% sales proceeds:  (i) the Consulting Agreement must be terminated, and (ii) Poe must forego all "future revenues associated with the agreement." [Docket No. 31-4, at ¶ 6.] According to Defendants, for this language to be operative, the timing of these covenants matters, such that the Consulting Agreement must still have been in effect (i.e., Poe must have still been engaged as a consultant) at the time the company was sold. This, Defendants argue, is the bargain the parties negotiated in the event of a sale. Hence, under Defendants' reading of the Sales Clause, the Sales Clause became inoperative upon termination of the Consulting Agreement in 2009, years before the sale to TransUnion.

16

The Court finds Defendants' interpretation reasonable. The Court also finds the following hypothetical helpful to its reasonable analysis. For example, had the sale of the company occurred thirty years later, (*e.g.*, in 2037), not only could the Consulting Agreement not be terminated (because it was previously terminated in 2007 when Poe ceased providing consulting services to the company), but there also would be no future revenues under the Consulting Agreement for Poe to forego (because Poe was entitled to a maximum of 20-years of commission payments for clients he helped retain during his tenure with the company). Yet, under Poe's interpretation of the Sales Clause, he would still be entitled to 15% of the sales proceeds no matter how many years it had been since his consulting relationship had terminated. Defendants' interpretation appears to make common sense. It puts a period, not a comma, on any successor's exposure. In other words, the timing of the termination of the Consulting Agreement – whether pre-sale or upon sale – defines the liabilities inherited by a successor company.

Poe makes several counter arguments, of which only one merit serious

consideration.[10] Poe argues that Defendants' plain language interpretation defies

common sense and would incentivize Defendants to terminate the Consulting

Agreement in anticipation of a sale of the company to avoid their obligation to pay

him his 15% share of the proceeds. Poe is correct insofar as this interpretation may

create a perverse incentive for Defendants, but it is not the Court's role to write a

better contract among the parties just because the result of the contract they have

written seems unfair. The "strongest external sign of agreement between contracting

parties is the words they use in their written contract." *Mellon Bank, N.S. v. Aetna*

*Business Credit, Inc.*, 619 F.2d 1001, 1008 (3d Cir. 1980). This is especially so where

the parties, as here, are sophisticated parties (*i.e.*, licensed attorneys). *See Brookers*

*Title Co., Inc. v. St. Paul Fire & Marine, Ins.*, 610 F.2d 1174, 1180-81 (3d Cir. 1979).

    Poe presses his argument against a literal interpretation of the Sales Clause,

and, as best the Court can decipher, his argument is that in the Sales Clause, the

---

[10]  The Court readily disposes of Poe's following arguments. First, his argument
regarding the fact that TransUnion continues to pay him for his commissions goes to
the survivability of the Commission Clause and says nothing about the Sales Clause.
Defendants do not dispute the survivability of the Commission Clause, nor could
they given the explicit survival language contained in the Commission Clause.
Second, Plaintiff's reliance upon the First Modification Agreement, Second
Modification Agreement, and the Termination Letter are misplaced. A reading of
both the First Modification Agreement and Second Modification Agreement take the
Court back to an interpretation of the Consulting Agreement, as both clearly state
that other than the express modifications made by the applicable amendments, the
provisions of the original Consulting Agreement are to remain in full force and
effect. [Docket Nos. 31-5, at 1-2; 31-6, at ¶ 7.] The Termination Letter simply states
that the company will abide by its post-termination obligations to Poe, including by
making post-termination commission payments as required under the Commission
Clause in Section 6 of the Consulting Agreement. [Docket No. 55-4.]

language "in exchange for a termination of this consulting agreement" presents a latent ambiguity: "in exchange for" does not necessarily dictate the order in which the termination of the Consulting Agreement prong must occur (*i.e.*, termination of the Consulting Agreement could have occurred before the sale (as it did here), upon the sale, or thereafter).

A claim of latent ambiguity must be based on a "contractual hook." *Bohler-Udoleholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 96 (3d Cir. 2001). That is, "the proffered extrinsic evidence must support an alternative meaning of a specific term . . . rather than simply support a general claim that the parties meant something other than what the contract says on its face." *Id.* "In other words, the ambiguity inquiry must be about the parties' 'linguistic reference' rather than about their expectations." *Id.* (citation omitted). Finally, a proffered alternative meaning must be reasonable. *Id.* Again, as best the Court can determine, Poe's claim appears to be that the words "in exchange for" have no temporal precision such that, the argument goes, Poe is entitled to the 15% proceeds in 2014 because the "in exchange for" prong (i) had been satisfied in 2007 with respect to termination of the Consulting Agreement, and (ii) would be satisfied with respect to future commissions owed to Poe that he would forego.[11]

---

[11] This, of course, raises another question. At no time since the sale has Poe given up his right to commissions. To the contrary, he is suing to have greater commissions paid to him. Clearly, he would not be entitled to keep both his 20-year commissions and 15% of the sales proceeds under any interpretation of the Consulting Agreement. Presumably, if Poe were to prevail on his interpretation of the Sales Clause, the

At this point, the Court finds that Poe has proffered at least an alternative meaning for the "in exchange for" language. Whether that alternative meaning is reasonable remains. Although the example of the sale occurring in 2037, see *supra*, demonstrates an interpretation that will require a heavy lift for Plaintiff under his interpretation, the Court will hear objective evidence in support of Poe's interpretation of the Sales Clause.[12] *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F2d 1001, 1011 (1980) ("The trial judge must then determine if a full evidentiary hearing is warranted. If a reasonable alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder"). Accordingly, the Court will defer its ruling as to Count II (Breach of Contract) pending an evidentiary hearing.

The hearing will be limited to one specific issue:  whether the "in exchange for" language in the Sales Clause in Section 6 of the Consulting Agreement requires a temporal limitation. Discovery will also be limited in-scope to this specific issue. The parties shall meet and confer and propose a limited discovery schedule before United States Magistrate Judge Sharon King that supports their interpretation of the

---

amount of any sales proceeds he would be entitled to receive would be offset by commissions he has received since the date of the sale and would have to repay.

[12] Obviously, if the Court has misconstrued Poe's interpretation, he shall file a Motion to Reconsider.

Sales Clause.[13] Upon completion of discovery, the Court will conduct an evidentiary hearing. The Court takes note that because the TransUnion Defendants were not a party to the Consulting Agreement or involved in the negotiation thereof, which occurred years before the sale of the company to TransUnion, the TransUnion Defendants need not participate in discovery or the evidentiary hearing on the narrow issue identified by the Court if they so choose.

Finally, the Court notes that Poe's claim for breach of contract is not barred by the statute of limitations. Under New Jersey law, a claim for breach of contract must be asserted within the six-year statute of limitations period as prescribed by statute. *See Thakar v. JFK Med. Ctr.*, 2007 WL 1498816, at *1 (N.J. Super. Ct. App. Div. May 24, 2007) (citing N.J. Stat. Ann. § 2A:14-1). Here, the alleged sale which gave rise to Poe's claim that he is entitled to proceeds from the sale under the Consulting Agreement occurred in November 2014; Poe filed the initial Complaint on October 16, 2020.

## IV.   CONCLUSION

For the foregoing reasons, the Motion to Dismiss the Amended Complaint filed by the Individual Defendants [Docket No. 53] and the Motion to Dismiss the Amended Complaint filed by all other served Defendants [Docket No. 55] are hereby

---

[13] Anticipating a dispute, the Court holds that no discovery involving Poe's fraud claims appears necessary at this stage of the litigation. For now, Poe's fraud claims remain, but as discussed above, if Poe's claim that he is entitled to the 15% sales proceeds under the Consulting Agreement is deficient because there has been no breach of contract, his fraud claims must necessarily fail.

**CONTINUED**. The parties shall engage in limited discovery on the very narrow issue set forth by the Court in this Opinion, and upon the conclusion of discovery, the Court shall hold an evidentiary hearing.


December 15, 2021                                    s/Renée Marie Bumb
Date                                                        Renée Marie Bumb
                                                               U.S. District Judge