IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ERIC POE,<br><br>          Plaintiff,<br><br>   v.<br><br>DRIVER HISTORY SALES CORP.,<br>*et al.*,<br><br>          Defendants. | Civil Action No. 1:20-14586<br>(RMB-SAK)<br><br><br>**OPINION** |

**RENÉE MARIE BUMB, Chief United States District Judge**

From Plaintiff Eric Poe's ("Plaintiff's") perspective what follows is a Pynchonesque plot of corporate intrigue, webby conspiracies, and convoluted financial transactions instigated to deprive him of 15% of a sale to which he was contractually entitled. Defendants Stephen Esposito and Scott Nichols (together, "Individual Defendants") contrastingly relate an everyday parting of the ways following the termination of the parties' contractual relationship and Plaintiff's right to sale proceeds. Individual Defendants move for summary judgment as to Plaintiff's common law fraud and breach-of-contract claims on many grounds. Having considered the parties' submissions, the Court resolves the Motion without oral argument. FED. R. CIV. P. 78(b); D.N.J. LOC. CIV. R. 78.1(b). Upon finding that genuine disputes of material fact are pervasive, the Court will **DENY** Individual Defendants' Motion for Summary Judgment and intends to **SCHEDULE** this matter for **TRIAL** upon submission of the Final Pre-Trial Order.

# I.    FACTUAL BACKGROUND[1]

The present discontent arises from the use of a propriety database compiling driver history data for insurance risk assessment.  In late 2006, Third Party Defendant Mark Bernstein[2] ("Bernstein") and Individual Defendant Esposito—the creators and proprietors of the database—contacted Plaintiff, in his capacity as the Chief Operating Officer of Citizens United Reciprocal Exchange Auto Insurance ("CURE"), proposing CURE's use of the database.  [Ind. Defs.' SOMF, at ¶¶ 1–5, 13–14.]  Contract negotiations soon began and, in March 2007, Individual Defendant Esposito, carbon copying Bernstein, emailed Plaintiff a draft database licensing agreement between CURE and Drivers History Inc. ("DHI").  [*Id.*, at ¶¶ 15–18.]  The draft agreement identified Plaintiff as the duly authorized representative of CURE as its President and Chief Executive Officer.  [Ex. 4, at 11.]  Plaintiff, who disputes the "details of a final agreement," testified to "there being a database license agreement between one of Mr. Esposito's companies and [CURE]", but could not recall reviewing it as

---

[1] Unless otherwise indicated, exhibit citations are to those appended to Individual Defendants' brief.  On this note, because the Court will deny summary judgment after considering the cited record evidence, Plaintiff's general and procedural objections to Individual Defendants' Statement of Undisputed Facts do not require resolution.  [Pl.'s SOMF, at 2–4.] That said, throughout their Statement of Undisputed Facts Individual Defendants routinely cite to deposition testimony without providing the corresponding exhibit number.  *See generally* [Ind. Defs.' SOMF.]  Going forward, Individual Defendants are advised to cite to the corresponding exhibit number.  The Court additionally requests that Individual Defendants cite to only *material* facts necessary to resolve a motion for summary judgment.  *See* D.N.J. Loc. Civ. R. 56.1(a).  Individual Defendants' fractional use of the 150 "material" facts in their Statement of Undisputed Facts belies their materiality and imposes unnecessary burdens on a Court saddled with motions.  *See generally* [Ind. Defs.' Br.]

[2] Along with their Answer to the operative complaint, Individual Defendants filed a Third Party Complaint against Bernstein seeking contribution from him for any and all amounts that Plaintiff may receive.  [Docket. No. 114.]

he "would have sent it to my general counsel … [because] … I don't review contracts." [Pl.'s SOMF, at ¶ 18 (quoting Ex. 63, at 36:13–16, 37:15–25).]

In early October 2007, Plaintiff, Individual Defendants, and Bernstein began contract negotiations over Plaintiff's assistance "to help procure contracts from outside insurance companies related to the sale of data relating to unofficial drivers histories." [Ex. 11, at ¶ A; Ind. Defs.' SOMF, at ¶ 19.]  The parties dispute whether and to what extent Individual Defendant Nichols participated in contract negotiations.  [Ind. Defs.' SOMF, at ¶ 31; Pl.'s SOMF, at ¶ 31.]  On October 25, 2007, Individual Defendant Esposito, once more carbon copying Bernstein, emailed Plaintiff a draft contract identifying Driver History Sales Corp. ("DHIS") as the "Customer", or "the company" as Individual Defendants phrase it in their factual recitation, DHI "as the parent company of DHIS", and Plaintiff as the "Consultant". [Ind. Defs.' SOMF, at ¶¶ 23–25; Ex. 11, at 3].  The draft agreement is clearly "between" Plaintiff and DHIS.  [Ex. 11, at 3 (alteration in original).]

Believing that DHIS was a legally incorporated entity, Plaintiff executed a final revised agreement (the "Consulting Agreement") with DHIS, effective October 22, 2007.  [Pl.'s Suppl. SOMF, at ¶ 2 (citing Ex. 63 at 22:16–25:9); Ind. Defs.' SOMF, at ¶ 28 (citing Ex. 11).] Individual Defendant Esposito signed the contract on behalf of DHIS, an entity which Individual Defendants "intended to" incorporate but never did.  [Ex. 11, at 8; Ind. Defs.' SOMF, at ¶¶ 32 (citing Ex. 66, at 22:9–27:1), 37, 55–56; Pl.'s Suppl. SOMF, at ¶¶ 1 (citing Ex. 65, at 52:17–54:4, 74:18–22), 22 (quoting Ex. 67, at 33:20–23).]  Individual Defendant Nichols did not sign the Consulting Agreement in any capacity.  [Ex. 11, at 8.]

Section 6 of the Consulting Agreement animates this lawsuit.  It consists of two relevant parts.  First, the "Commission Clause" provides that Plaintiff's commissions would

"be paid from the clients he assists DHIS in retaining, for a period of 20 years from the date of the contract …., irregardless [sic] if [Plaintiff] is fired for good cause or not or decides to end his consulting relationship with DHIS." [*Id.*, at ¶ 6.]  Second, the so-called "Sale Clause", which immediately follows the Commission Clause and whose interpretation factors greatly in the pending Motion, reads as follows:

> <u>Moreover, in the event DHIS is sold directly (or indirectly through a sale of DHI parent company) Consultant will receive 15% of the sales proceeds of DHIS (or allocated share of such) in exchange for a termination of this consulting agreement and Consultant agrees to forego all future revenue associated with this agreement post sale.</u>

[*Id.* (underline in original).]

In September 2009, some two years after the Consulting Agreement entered into effect, Individual Defendant Nichols sent a letter (the "Termination Letter"[3]) on DHI letterhead to Plaintiff terminating the Consulting Agreement pursuant to its terms.  [Ind. Defs.' SOMF, at ¶¶ 62–63 (citing Ex. 26); Pl.'s SOMF, at ¶¶ 62–63 (citing Docket No. 19-5; Ex. 26).]  The Termination Letter refers to the Consulting Agreement as between DHIS and Plaintiff. [Docket No. 19-5; Ex. 26.]  According to the Termination Letter, "[t]he Company will abide by its past termination obligations. . . in accordance with the terms of the [Consulting] Agreement," which included Plaintiff's continued receipt of commission payments.  [Docket No. 19-5; Ex. 26; Ind. Defs.' Br., at 66.]

A dominant dispute between the parties is whether Plaintiff's post-contractual conduct dating from 2007 to 2013 reflects his intent to do business with DHI and not DHIS as well as

---

[3] Although discovery has apparently only intensified the parties' quarrel over the existence of two purported termination letters since the motion-to-dismiss stage, each was drafted on DHI letterhead and refers to the termination as between Plaintiff and DHIS.  *See* [Docket. No. 19-5; Ex. 26.]

Individual Defendants' fraudulent purposes.  Individual Defendants collate a bevy  of documentation—audits, bank statements, commission statements, corporate documentation, customer contracts, emails, financial records, subsequent addendums and agreements—to argue that Plaintiff knew quite well that DHIS did not exist as a separate corporate entity and that he always intended to collaborate with DHI.  *See* [Ind. Defs.' SOMF, at ¶¶ 39, 41–43, 53, 56, 69–72, 78–79, 83–87, 102–113, 117–20.]  While acknowledging receipt of most of these records, Plaintiff embraces not just these records but additional documentation as evidence of his continued belief of doing business with DHIS and Individual Defendants' use of it as a nonexistent corporate entity to defraud him of his contractual share to a future sale.  *See* [Pl.'s SOMF, at ¶¶ 39, 41–43, 53, 56, 69–72, 78–79, 83–87, 102–113, 117–20; Pl.'s Suppl. SOMF at ¶ 5.]

Proceeding along, what the Sales Clause envisions as a "sale" is hotly disputed by the parties.  In 2012, DHI and Court Services, Inc., ("CSI"), a company owned by Individual Defendants, merged into a new entity called DHIS LLC.  [Ind. Defs.' SOMF, at ¶¶ 9, 82, 95.] On August 3, 2012, DHIS LLC executed a "Membership Interest Purchase Agreement" with DHIS Partners, LLC, an entity affiliated with private equity firm Stadion Capital, who acquired a 45% "membership interest" in DHIS LLC for the "purchase price" of $5 million. [Ind. Defs.' SOMF, at ¶¶ 98–99; Pl.'s Suppl. SOMF, at ¶ 26.]  Individual Defendants claim this transaction constituted a "sale" pursuant to the Sales Clause and that Plaintiff failed to timely bring this action given his sufficient knowledge of it.  Plaintiff disagrees, contending that TransUnion's subsequent serial acquisitions of DHIS LLC in 2014 and 2015 are the properly considered "sales".

5

As noted, TransUnion acquired a majority interest in DHIS LLC for $43.8 million through three securities purchase agreements. [Ind. Defs.' SOMF, at ¶¶ 129, 134; Pl.'s Suppl. SOMF, at ¶ 34.] In March 2016, TransUnion purchased the remaining ownership interests in DHIS LLC for $18.5 million. [Ind. Defs.' SOMF, at ¶¶ 145–46.] After issuing two demand letters for he claims is his purported 15% of the total $62.3 million sale of DHIS LLC, Plaintiff filed the instant action. [*Id.*, at ¶¶ 149–50.] Plaintiff continues to receive commission payments from TransUnion pursuant to the Consulting Agreement, the precise amount of which is disputed by the parties. [Ind. Defs.' SOMF, at ¶¶ 132, 148; Pl.'s SOMF, at ¶¶ 132, 148; Pl.'s Suppl. SOMF, at ¶ 47.]

## II.    PROCEDURAL HISTORY

This action commenced with the filing of the initial Complaint on October 16, 2020. [Compl.] Plaintiff then timely filed the operative Amended Complaint on March 14, 2021, seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 and alleging claims for breach of contract, fraud, aiding and abetting fraud, and tortious interference of contract.[4] [Am. Compl., at ¶¶ 110–52.] As filed, there were four identifiable categories of defendants: the entities associated with the propriety database, DHIS and DHI's successor, DHIS LLC, which TransUnion ultimately acquired; the current parent companies of DHIS LLC, TransUnion, LLC, TransUnion Intermediate Holdings, Inc., and TransUnion (collectively, "TransUnion"); Individual Defendants Scott Nichols and Stephen Esposito; and John Doe(s), Jane Doe(s), and ABC Companies who allegedly participated in or aided and abetted the alleged fraud against Plaintiff. [*Id.*, at ¶¶ 10–21.]

---

[4] Plaintiff originally filed the Amended Complaint on March 12, 2021, [Docket No. 30], but submitted a corrected version two days later.

Following Plaintiff's settlements with TransUnion and DHIS LLC, the remaining defendants are DHIS, Individual Defendants, and the unidentified individuals and companies.  [Docket No. 157.]  Individual Defendants now move for summary judgment as to the declaratory judgment, breach-of-contract, and fraud claims against them.[5]  [Docket. Nos. 176, 176-1 ("Ind. Defs.' Br.").]  The Motion for Summary Judgment is fully briefed and ripe for review.  [Docket Nos. 179 ("Pl.'s Opp. Br."), 181 ("Ind. Defs.' Reply Br.").]

## III.    JURISDICTION

The Court exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  [Am. Compl., at ¶ 23.]  Plaintiff is a citizen of Pennsylvania.  [*Id.*, at ¶ 9.]  Individual Defendants are citizens of Utah and New Jersey who are alleged to have formed Defendant DHIS, an unincorporated association, for the purpose of defrauding Plaintiff of sale proceeds.  [*Id.*, at ¶¶ 12, 18–19.]

## IV.    LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be *no* genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit

---

[5] After ordering limited discovery, the Court denied Individual Defendants' Motion to Dismiss on January 25, 2023.  [Docket Nos. 53, 101–02.]

under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding the existence of a genuine issue of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). Nevertheless, "the mere existence of a scintilla of evidence," without more, will not give rise to a genuine issue for trial. *Anderson*, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate "[w]here the record ... could not lead a rational trier of fact to find for the nonmoving party...." *Matsushita Elec. Industrial Co.*, 475 U.S. at 586–87. "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a "fair-minded" jury could "reasonably" decide.'" *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)). If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

## V.    DISCUSSION

Plaintiff seeks a declaratory judgment and sets forth claims of common law fraud and breach of contract against Individual Defendants.  [Am. Compl., at ¶¶ 110–36.]  Individual Defendants variably argue for dismissal on the merits, personal liability in contract, statute of limitations, and economic loss doctrine.[6]  *See generally* [Ind. Defs.' Br.]  Fortunately, a significant amount of the respective analyses overlap, so the Court will proceed issue by issue, rather than claim by claim, for ease of readability.

### A. Personal Liability in Contract

Individual Defendants contend that neither can be held personally liable under the Consulting Agreement because Plaintiff "clearly intended to contract with DHI and Plaintiff knew that any acts of the Individual Defendants were in their capacity as agents for that company."  [*Id.*, at 15.]  Plaintiff generally relies on the language of the Consulting Agreement to argue that he intended to contract with DHIS, an allegedly nonexistent entity, thus rendering Individual Defendants personally liable.  [Pl.'s Opp. Br., at 28–32.]  After review, the Court finds that Plaintiff's interpretation of the Consulting Agreement on this issue is reasonable and personal liability potentially available so as to defeat summary judgment.

Under New Jersey law, "'[i]t is well settled that courts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the

---

[6] The parties' fracas over whether Individual Defendants properly moved for summary judgment on the declaratory judgment claim is moot because there are no grounds independent of those rejected herein upon which dismissal is premised.  [Pl.'s Opp. Br., at 21 n.5; Ind. Defs.' Reply Br., at 1 n.1.]

underlying purpose of the contract.'"[7] *Ly Berditchev Corp. v. Truss Costs. Corp.*, No. 2:22-CV-04242 (BRM) (CLW), 2025 WL 303993, at *7 (D.N.J. Jan. 27, 2025) (quoting *Dill v. Yellin*, 725 F. Supp. 3d 471, 481 (D.N.J. 2024)). "If the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect[,] … [b]ut [e]ven in the interpretation of an unambiguous contract, [courts] may consider all of the relevant evidence that will assist in determining [its] intent and meaning." *Manahawkin Convalescent v. O'Neill*, 85 A.3d 947, 958–59 (N.J. 2014) (internal citations omitted); *see Nat'l Util. Serv., Inc. v. Chesapeake Corp.*, 45 F. Supp. 2d 438, 446 (D.N.J. 1999) (citing *Atl. N. Airlines v. Schwimmer*, 12 N.J. 293, 301 (1953)) ("Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity.").

New Jersey law further dictates that, "[i]n a summary judgment motion pertaining to contract interpretation, granting the motion is only appropriate when the contractual language is unambiguous—*i.e.*, 'subject to only one reasonable interpretation.'" *Ly Berditchev Corp.*, 2025 WL 303993, at *7 (quoting *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013)); *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999). "If the nonmoving party presents a reasonable alternative reading of the contract, then a question of fact as to the meaning of the contract exists which can only be resolved at trial." *Newport Assocs. Dev. Co. v. Travelers Indem. Co.*, 162 F.3d 789, 792 (3d Cir. 1998) (citing *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987)); *Landtect Corp. v. State Mut. Life Assurance Co.*, 605 F.2d 75, 80 (3d Cir. 1979).

---

[7] Implicit in the parties' briefing is that New Jersey law applies, which is consistent with their intent as enshrined in the Governing Law provision of the Consulting Agreement. [Ex. 11, at ¶ 29.]

As to whom Plaintiff contracted with, the Consulting Agreement is clear on its face: DHIS. The contract's express terms clearly distinguish DHI from DHIS: (1) DHI is identified as "the parent company of DHIS"; (2) Plaintiff's 10% option purchase in DHIS "does not contemplate any ownership interest in DHI"; and (3) Individual Defendant Esposito signed the Consulting Agreement on behalf of DHIS, not DHI. [Ex. 11, at 2–3, 8.] This is hardly debatable. As Individual Defendants acknowledge, "[t]he polestar of contract construction is to discover the intention of the parties *as revealed by the language used by them*." [Ind. Defs.' Br., at 23 (citing *Karl's Sales & Servs., Inc. v. Gimbel Bros.*, 592 A.2d 647, 650 (N.J. App. Div. 1991) (emphasis added).] This polestar is all the more calibrated to DHIS being the contracting entity by Individual Defendants' admission that "[t]he draft agreement [of the Consulting Agreement] identified the company as DHIS" and "DHI … as the parent company of DHIS." [Ind. Defs.' SOMF, at ¶¶ 24–25 (citing Ex. 8).]

Notwithstanding the Consulting Agreement's language being "plain and capable of legal construction," *Manahawkin Convalescent*, 85 A.3d at 958–59, Individual Defendants switch gears and cite to Plaintiff's pre-contractual conduct to essentially argue that DHI and DHIS are one and the same, [Ind. Defs.' Br., at 15–22]. This is apparently so because Plaintiff knew of DHI prior to entering into the Consulting Agreement and allegedly conceded "that he intended to enter a contract with the drivers history entity providing the services that CURE was using," *i.e.*, DHI. [*Id.*, at 22.] As Plaintiff correctly points outs, however, the cited excerpts of his deposition testimony do not support this theory and he even testified later in the same deposition that he did not "recall" whether DHI … had entered into a database agreement with CURE." [Pl.'s SOMF, at ¶ 33 (citing Ex. 63, at 64:18–65:3).] Nevertheless, and even though the contract's language is unambiguous and Plaintiff's interpretation

certainly reasonable, Individual Defendants have produced just enough extrinsic evidence of the "surrounding circumstances", *Ly Berditchev Corp.*, 2025 WL 303993, at *7, to cause this Court hesitation in ruling in Plaintiff's favor under New Jersey law, *see* [Ind. Defs.' SOMF, at ¶¶ 39, 41–43, 53, 56, 69–72, 78–79, 83–87, 102–113, 117–20]; *see also infra*, at 24–25 (finding dispute of material fact as to whether Plaintiff's post-contractual conduct reveals his intention to contract with DHIS or DHI for purposes of fraud claim).[8] Thus, for the foregoing reasons, principles of New Jersey contract law constrain this Court to find that summary judgment is not appropriate under these circumstances.[9] *Newport Assocs. Dev. Co.*, 162 F.3d at 792; *Landtect Corp.*, 605 F.2d at 80.

---

[8] This line of reasoning also dispenses with Individual Defendants' additional argument that, although the Consulting Agreement "clearly discloses that DHI … is the parent company of DHIS and Plaintiff knew of DHI's existence," DHIS is merely a "common name[ ] or trade name[ ]" for DHI. [Ind. Defs.' Br., at 16–17.] How or why a clearly identified subsidiary—which is allegedly nonexistent—is synonymous with its clearly identified parent company is left unexplained. *See* [*id.*] This lack of explanation, along with the discussion above, does not render unreasonable Plaintiff's interpretation that he intended to contract with DHIS. Additionally, the out-of-circuit cases cited by Individual Defendants have nothing to do with whether persons allegedly misrepresenting the existence of a corporate entity and signing a contract on its behalf may be personally liable under New Jersey law. *See The Promotion Co./Special Events Div. v. Sweeney*, 782 N.E.2d 117 (Ohio App. 2002); *Evans v. Med. & Pro. Collection Servs., Inc.*, 741 N.E.2d 795 (Ind. Ct. App. 2001).

[9] Individual Defendants separately argue that DHI's and Plaintiff's post-contractual conduct show that DHIS and DHI functioned as a single entity such that DHI as the parent company, may be held liable, but not Individual Defendants personally. [Ind. Defs.' Br., at 18–20.] Rather too cleverly by half, Individual Defendants are practically asking the Court to pierce DHIS's corporate veil and assign potential contractual liability to DHI so as to save themselves from personal liability; hence their recognition that the present situation "is *not unlike* a scenario in which a parent company is liable for the contractual obligations of its subsidiaries." [*Id.*, at 18 (emphasis added).] Whatever the dubious merit this theory may possess, the fatal defect is that it fundamentally misunderstands the facts of this case and requires there to be a corporate veil to pierce in the first place.

As explained above, the summary judgment record establishes that Individual Defendant Esposito signed the Consulting Agreement on behalf of DHIS, a nonexistent entity, which Plaintiff believed was incorporated and extant. Under these circumstances, it would strike the

Consequently, the question of Individual Defendants' personal liability for contracting on the behalf of DHIS, an entity Plaintiff believed legally incorporated but which never was, is also unsuitable for resolution at this time.  *See Fashion Brokerage Int'l, LLC v. Jhung Yuro Int'l LLC*, No. CIV. 10-746 RBK/JS, 2011 WL 976478, at *4 (D.N.J. Mar. 14, 2011) (first citing *Fed. Adver. Corp. v. Hundertmark*, 160 A. 40, 40 (N.J. 1932); and then citing *Gallant v. Fashion Piece Dye Works*, 174 A. 248, 249 (N.J. Ch. 1934)) ("A person is individually liable for contracts he signs under a nonexistent corporate name."); [Ind. Defs.' SOMF, at ¶¶ 32, 37, 55–56; Pl.'s SOMF, at ¶ 1 (citing Ex. 65, at 52:17–54:4, 74:18–22), ¶ 2 (citing Ex. 63, at 22:16–25:9), ¶¶ 13–14 (quoting Docket No. 88, at 71:20–24, 72:9–15), ¶ 15 (quoting Docket No. 90-1, at ¶¶ 5–6)], ¶ 22 (quoting Ex. 67, at 33:20–23).]

Relatedly, Individual Defendants assert that if personal liability obtains, it cannot attach to Individual Defendant Nichols because he "had no involvement whatsoever in the negotiation or execution of the Consulting Agreement", "did not even find out about the Consulting Agreement or Plaintiff's involvement …until after its execution", and "repeatedly told [Plaintiff] over and over again that DHIS did not exist separately from DHI … and further explained the corporate names on several occasions".  [Ind. Defs.' Br., at 22–23 (citing Exs. 5–10, 68, at 8:10–11:8).]  Plaintiff disputes this alleged noninvolvement, citing to deposition

---

Court as perverse to permit individuals to protect themselves against personal liability by availing themselves of veil-piercing theories meant to protect against abuses of the corporate form.  This may explain why the cases cited by Individual Defendants do not lend support to their cause.  *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001); *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 545 (9th Cir. 1985); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 237 (D. Del. 1984); *State, Dep't of Env't Prot. v. Ventron Corp.*, 468 A.2d 150, 164–65 (N.J. 1983).  The Court declines to fashion out of whole cloth legal theories not supported by the papers and in the presence of a deeply contested factual environment.  There is therefore no compelling reason to address Plaintiff's alternative argument that personal liability may lie on a theory of piercing the corporate veil.  [Pl.'s Opp. Br., at 31–32.]

testimony wherein he testified to multiple in-person, telephonic, and electronic conversations he had with both Individual Defendants and Bernstein over the terms of the Consulting Agreement during negotiations. [Pl.'s Opp. Br., at 32 (citing Ex. 64, at 40:17–22, 43:01–08, 44:3–11).] There is no dispute, however, that Individual Defendant Nichols did not sign the executed Consulting Agreement in any capacity. [Ex. 11, at 8.]

"[E]ven accepting Plaintiff's testimony as true," [Ind. Defs.' Reply Br., at 11], in Individual Defendants' words, the question then becomes whether, as a matter of New Jersey law, a non-signatory to a contract may nevertheless be held personally liable in contract under allegedly fraudulent circumstances. Individual Defendants richly argue that "Plaintiff provides no legal authority" to do so, [*id.*], yet, neither have the Individual Defendants, as movants of the pending Motion, supplied *any* caselaw or legal discussion as to why a non-signatory who disputedly committed fraud during pre-contract negotiations cannot be held liable under contract. *See* [Ind. Defs.' Br., at 22–23; Ind. Defs.' Reply Br., at 11.] The Court will not assume the role of a *pro bono* amanuensis,[10] and summary judgment is therefore not appropriate.[11]

## B. The Economic Loss Doctrine

Next, the Court finds that Plaintiff's fraud claim is not precluded by New Jersey's economic loss doctrine. Under New Jersey law, the economic loss doctrine "prohibits

---

[10] So finding, there is no reason to determine whether Individual Defendant Nichols's post-contractual conduct has any bearing on his personal liability as a non-signatory to the Consulting Agreement. [Ind. Defs.' Br., at 23.]

[11] To the extent Individual Defendants intended this argument to apply to the fraud claim as well, that claim also survives summary judgment because the failure to educate the Court on this issue equally afflicts Individual Defendants' position. *See* [Ind. Defs.' Br., at 22–23; Ind. Defs.' Reply Br., at 11.]

plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." *LM Ins. Corp. v. Favor Servs. Inc. & Novie Pramudita*, No. 24-05932 (KMW-EAP), 2025 WL 3451333, at *7 (D.N.J. Dec. 1, 2025) (internal citation omitted). Individual Defendants argue that Plaintiff's "only claimed damages"—his 15% of the sale proceeds—singularly relate to alleged contractual nonperformance and not to any fraud on their behalf. [Ind. Defs.' Br., at 14.]

"The threshold question regarding the economic loss doctrine's applicability to fraud and contract claims plead together 'is whether the allegedly tortious conduct is extraneous to the contract.'" *Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 465 (D.N.J. 2020) (internal citation omitted). It is well-settled that tortious extraneity normally lies in fraudulent inducement claims, which "may proceed alongside a breach of contract claim because the former is based on pre-contractual misrepresentations that are extrinsic to the parties' agreement." *Id.* (citations omitted); *see Grasso Foods, Inc. v. Wynn Env't Sales Co.*, No. CV 17-6430 (RMB/AMD), 2018 WL 3455479, at *3 (D.N.J. July 18, 2018) (collecting cases recognizing fraud-in-the-inducement exception to New Jersey's economic loss doctrine). Plaintiff's theory is that Individual Defendants fraudulently induced him to sign the Consulting Agreement by misrepresenting the corporate existence of DHIS, which, as explained above, he has marshaled sufficient material facts to survive summary judgment. *See supra*, at 9–14; *see also infra*, at 24 (finding dispute of material fact as to whether Individual Defendants materially misrepresented the separate corporate existence of DHIS under theory of fraudulent inducement).

Individual Defendants retort that Plaintiff's claim is intrinsically contractual because "the claimed misrepresentation consist[ed] solely [of] being given a copy of the contract

15

naming DHIS as a party." [Ind. Defs.' Reply Br., at 7.]  Whatever the merit of this argument as a matter of (unbriefed) law, the record evidence also includes a *draft* of the Consulting Agreement exchanged during negotiations which Individual Defendants concede identified DHIS as the company.   [Ind. Defs.' SOMF, at ¶¶ 24–25 (citing Ex. 8).]   Individual Defendants, moreover, fail to consider that Plaintiff is also seeking punitive damages which are generally not recoverable under New Jersey contract law.   [Am. Compl., at 33]; *see Heartland Payment Sys., LLC v. Carr*, No. CV-189764-BRM-DEA, 2020 WL 13580941, at *5 (D.N.J. Dec. 28, 2020) (citing *Thomas v. Nova Se. Univ.*, 468 F. App'x 98, 100 (3d Cir. 2012)) ("Defendants are generally correct that punitive damages may not be awarded for contractual claims.").  As such, Plaintiff's claim of fraud is not barred by the economic loss doctrine and may proceed.

### C.  The Sales Clause

Moving on to the merits of Plaintiff's breach-of-contract claim, Individual Defendants dually argue that the record evidence in this case leads to only one reasonable interpretation of the Sales Clause: it "did not survive the termination of the Consulting Agreement" and, further, that a 2012 transaction was a "sale" under the Sales Clause which Plaintiff had sufficient knowledge of but failed to timely act upon in accordance with the statute of limitations. [Ind. Defs.' Br., at 27–34.]  Each is addressed in turn.  The Sales Clause reads as follows:

> Moreover, in the event DHIS is sold directly (or indirectly through a sale of DHI parent company) Consultant will receive 15% of the sales proceeds of DHIS (or allocated share of such) in exchange for a termination of this consulting agreement and Consultant agrees to forego all future revenue associated with this agreement post sale.

[Ex. 11, at ¶ 6.]

### a. Survivability

The parties agree that the Consulting Agreement was terminated in September 2009. [Ind. Defs.' SOMF, at ¶ 62; Pl.'s SOMF, at ¶ 62.]   What is disputed is whether the Sales Clause and Plaintiff's 15% entitlement to a future sale survived the termination.[12]  [Ind. Defs.' Br, at 23–27; Pl.'s Opp. Br., at 32–34.]   Individual Defendants mainly advocate for a straightforwardly plain reading of the Sales Clause's language: Plaintiff would receive 15% of a future sale *in exchange for termination of the Consulting Agreement* and future commission payments.  [Ind. Defs.' Br., at 23–27.]   Individual Defendants' illustrative hypothetical in support—assuming Plaintiff's proffered interpretation that termination of the Consulting Agreement is immaterial, then he could theoretically receive 15% of a given sale *in addition to* 20 years of commission payments, thus depriving Individual Defendants of consideration—is more straw than steel man, however.  Plaintiff's cited record evidence recognizes this fodder for what it is and allows the livestock to peaceably graze.

During his deposition, Plaintiff testified that he understood his 15% entitlement to the sale proceeds would be in exchange for termination of his commission payments.[13]  [Pl.'s Suppl. SOMF, at ¶¶ 11 (citing Ex. 64, at 27:16–23, 31:8–13).]   Given that Plaintiff's commission payments are capped at 20 years under the Consulting Agreement, this

---

[12] The parties' quarrel over the existence of two purported termination letters and the concomitant evidentiary issues do not factor into their arguments over the interpretation of the Sales Clause.  *See* [Ind. Defs.' Br., at 23–27; Pl.'s Opp. Br., at 32–34; Ind. Defs.' Reply Br., at 8–9.]

[13] On first blush, Plaintiff's deposition testimony would appear to support Individual Defendants' position, as he testified that his 15% entitlement arose if the company was "sold at any point in time." [Ex. 64, at 27:16–23.]  Counsel's follow-up hypothetical, when viewed in the light most favorable to Plaintiff, qualifies the "any point in time" language to such a period when Plaintiff would still be receiving commission payments.  [*Id.*, at 31:8–13].

interpretation would naturally impose 20-year temporal limitation on his 15% entitlement. [Ex. 11, at ¶ 6.] This position also has textual support, as Plaintiff's entitlement would be "in exchange for a termination of this consulting agreement and *Consultant agrees to forego all future revenue associated with this agreement post sale.*" [*Id.* (emphasis added).] This language reasonably presupposes ongoing commission payments. Bernstein, who Individual Defendants recognize as "being involved in the negotiation of the Consulting Agreement," [Ind. Defs.' Br., at 26], concurringly attested that, "It was always my understanding, and remains my understanding, that … [Plaintiff] was entitled to a portion of the sales proceeds at any time that the company was sold," at which point Plaintiff "would stop receiving commissions after the sales proceeds were paid to him," [Pl.'s Suppl. SOMF, at ¶¶ 18–19 (citing Docket No. 90-1, ¶¶ 8, 10)]. After considering "the intent of the parties, the express terms of the contract, [and] surrounding circumstances," *Ly Berditchev Corp.*, 2025 WL 303993, at *7, the Court finds that Plaintiff's interpretation of the Sales Clause is reasonable, and thus the survivability of the Sales Clause is interpretatively ambiguous whose resolution is reserved for the factfinder.[14] *Newport Assocs. Dev. Co.*, 162 F.3d at 792; *Landtect Corp.*, 605 F.2d at 80.

---

[14] The Court's finding does not change when considering Individual Defendants' evidence that Plaintiff, in 2011, had a business evaluator prepare a valuation of his "revenue sharing agreement" which did not include "any reference to the sales clause and Plaintiff's ability to receive 15% of the proceeds of a future sale." [Ind. Defs.' SOMF, at ¶ 91 (quoting Ex. 32).] The argument being that had Plaintiff truly believed his entitlement survived termination, it would have been included in the valuation. [Ind. Defs.' Br., at 26.] However believable this interpretation of the evidence may be, the language of the Sales Clause and Plaintiff's record evidence demonstrate the reasonableness of his interpretation.

### b. The Statute of Limitations

The parties agree that New Jersey's six-year statute of limitations applies to Plaintiff's breach-of-contract claim.[15]  [Ind. Defs.' Br., at 29; Pl.'s Opp. Br., at 34]; *see* N.J. STAT. ANN. § 2A:14-1.  Because Plaintiff filed the original Complaint in October 2020, its timeliness would likely rest on an October 2014 accrual date.  [Compl.]  Individual Defendants argue that Plaintiff's breach-of-contract claim is time-barred because he was sufficiently aware of a 2012 "sale" no later than June 21, 2013.  [Ind. Defs.' Br., at 28–34.]  Plaintiff counters that the proper "sales" were the November 2014 and March 2016 TransUnion transactions.  [Pl.'s Opp. Br., at 35.]  By way of background, in 2012, DHI and CSI merged into a new entity called DHIS LLC.  [Ind. Defs.' SOMF, at ¶ 95; Pl.'s SOMF, at ¶ 95.]  On August 3, 2012, DHIS LLC executed a "Membership Interest Purchase Agreement" with DHIS Partners, LLC, who acquired a 45% "membership interest" in DHIS LLC for the "purchase price" of $5 million.  [Ex. 37, at 2.]

According to Individual Defendants, Plaintiff's sworn interrogatory response establishes the parties' intent to have the Sales Clause "apply to **any** sales event."  [Ind. Defs. Br., at 31–33 (emphasis in original).]  Plaintiff, on the other hand, posits that the 2012

---

[15] The Court will not indulge Individual Defendants' argument that the fraud claim is time-barred as "[i]t is not the Court's responsibility to sift through the record—let alone a voluminous record like the one here—to find evidence supporting [their] position."  *Dor v. TD Bank*, No. 2:21-CV-18955-BRM-LDW, 2023 WL 9017558, at *10 (D.N.J. Dec. 29, 2023) (internal citation omitted); *DeShields v. Int'l Resort Props. Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) (internal citation omitted) ("[J]udges are not like pigs, hunting for truffles buried in briefs.").  Individual Defendants' brief on this issue contains not a single citation to the record to support their factual claims.  *See* [Ind. Defs.' Br., at 27–28.]  What is more, Individual Defendants myopically focus their argument on Plaintiff's cognizance of DHIS's legal corporate status and omit entirely any mention of when he might have reasonably discovered the relevant sale, thus depriving him of his 15% entitlement— the alleged purpose of the machination.  *See* [*id.*]

transaction was "a minority investment" that did not trigger the Sales Clause. [Pl.'s Opp. Br., at 35.] Neither party offers any argument as to the meaning of the language of the Sales Clause, jumping straight to extrinsic evidence. *See* [Ind. Defs.' Br., at 31–34; Pl.'s Opp. Br., at 35–18; Ind. Defs.' Reply Br., at 12–14.] For its own sake, the Court will begin with the "plain and ordinary meaning" of the Sales Clause. *Progressive Garden State Ins. Co. v. Metius*, 581 F. Supp. 3d 661, 667 (D.N.J. 2022) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002)).

To start, the term "sale" is not defined in the Consulting Agreement. *See* [Ex. 11.] The Oxford English Dictionary broadly defines "sale" as "[t]he action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration." THE OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/sale_n2?tab=meaning_and_use#24383209 (last visited Dec. 8, 2025); *see Centennial Plaza Prop, LLC v. Trane U.S. Inc.*, 771 F. Supp. 3d 481, 489 (D.N.J. 2025) (giving contract terms their plain and ordinary meaning "often" requires using "general-use dictionaries") (collecting cases). The ordinary meaning of "sale" thus appears to encompass transfers of any ownership interest from one to another at a price, regardless of whether the transaction would net the seller a gain or loss. *See* THE MERRIAM–WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary /sale (last updated Dec. 8, 2025) (defining "sale" as "the transfer of ownership of and title to property from one person to another for a price").

But, when "read 'as a whole in a fair and common sense manner'", it is unclear if a divisible sale of DHIS would trigger the Sales Clause, which Individual Defendants further muddle by their position that DHIS is a nonexistent corporate entity. *Manahawkin*

*Convalescent*, 85 A.3d at 958 (quoting *Hardy ex rel. Dowdell v. Abdul–Matin*, 965 A.2d 1165 (N.J. 2009)).  That clause is triggered "in the event *DHIS* is sold" and Plaintiff would "receive 15% of the sales proceeds of *DHIS*."  [Ex. 11, at ¶ 6 (emphasis added).]  Put differently, the Sales Clause conceivably refers to DHIS in its totality.  Harking back to Individual Defendants' hypothetical eviscerating their consideration under one interpretation of the Sales Clause, Plaintiff's own empty-handedness is equally imaginable under a broad definition of "sale".  If the Sales Clause could be triggered by *any* divisible sale of DHIS, then it is contemplatable for Plaintiff to receive a fractional amount of a hypothetical sale in the first year of the Consulting Agreement, thereby possibly foregoing nineteen lucrative years of commission payments. Being aware of the sums involved in this case, surely there cannot be much debate that this scenario is not likely what Plaintiff intended when he executed the Consulting Agreement. At best, the language of the Consulting Agreement is ambiguous as to the definition of the term "sale".

Onward to the parties' extrinsic evidence, which is limited to Plaintiff's interrogatory response and expert opinion.  When questioned if the Sales Clause "was intended to cover any positive purchase event, whether a whole or partial asset sale, a whole or partial stock sale or any other purchase transactions," Plaintiff responded as follows: "Section 6 was intended to, and it does broadly cover, any positive purchase event, be it a whole or partial asset sale, a whole or partial stock sale or any other purchase transaction."  [Ex. 51, at ¶ 3.] Individual Defendants take Plaintiff's alleged admission to mean that "sale" "broadly covers any purchase transaction to include a partial stock/membership sale of 45% of the company." [Ind. Defs.' Br., at 33.]

Plaintiff, in response, points out that the "prefatory phrase" "positive purchase event" qualifies any intended meaning of "whole or partial asset, a whole or partial stock sale or any other purchase transaction" to exclude the purchase of a minority ownership interest.  [Pl.'s Opp. Br., at 37.]  But this contention is mere argument and not directly supported by Plaintiff's cited summary judgment evidence; Plaintiff's testimony that he understood the Sales Clause to be triggered "if the entire company was sold in 2012", while relevant, does not appear to touch upon the definition of "positive purchase event".  *See* [Pl.'s Opp. Br., at 37 (quoting Ex. 63, at 132:22–24).]  Be that as it may, and while Individual Defendants' position that to equate "positive purchase event" to a sale of the entire company is certainly reasonable in light of the "plain language meaning of partial stock sales, partial asset sales and any other purchase transaction," [Ind. Defs.' Br., at 14], the Court is essentially being asked to premise the legal construction of a contractual term on the derivative legal construction of a non-contractual term used in the course of discovery and left undefined (or ambiguously so) by the parties. This, along with the intrinsically ambiguous definition of "sale" persuades the Court that both parties' proffered interpretations of "sale" as used in the Sales Clause are reasonable, delegating it to the jury to decide.[16]  *Newport Assocs. Dev. Co.*, 162 F.3d at 792; *Landtect Corp.*, 605 F.2d at 80.

---

[16] As the Court has already determined that there exists a genuine dispute of material fact as to the meaning of "sale", the Court declines to consider the opinion of Plaintiff's retained expert, Dr. Jeffrey M. Katz, that the 2012 transaction was an investment and not a sale according to applicable accounting standards.  Neither party has briefed the issue of whether a federal court sitting in diversity and applying New Jersey substantive law and federal procedural law may properly consider an expert's opinion on contract interpretation, and, if so, what the proper scope of that opinion maybe.  *See* [Ind. Defs.' Br., at 31–32; Pl.'s Opp. Br., at 35–36; Ind. Defs.' Reply Br., at 12–13.]  Seeing no need to wade into waters the parties themselves have avoided, the Court will stay out of the water as well.  The finding of this factual ambiguity also nullifies any need to address Individual Defendants' alternative argument that, no later than June 21, 2013, Plaintiff was sufficiently aware of the 2012

### D. The Fraud Claim

To state a claim for common law fraud under New Jersey law, a plaintiff must show: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005) (quoting *German v. Weichert Co. Realtors*, 691 A.2D 350, 367 (N.J. 1997)). Individual Defendants primarily argue that Plaintiff's fraud claim fails because they never "affirmatively" represented that DHIS was a separate legal entity and that Plaintiff knew that DHI, not DHIS, was the "actual entity" he consulted for both before and after contract execution. [Ind. Defs.' Br., at 7–12.]

As demonstrated above, there is a clear dispute of material fact as to whether Individual Defendants materially[17] misrepresented the separate corporate existence of DHIS during contract negotiations and at the time of execution. *See supra*, at 9–14. The argument that Plaintiff simply "assumed" DHIS's legal corporate existence following receipt of the draft contract and then its finalized version identifying DHIS is, to say the least, unpersuasive.[18]

---

transaction such that a reasonable person would have been alerted to the possibility of an actionable claim. [Ind. Defs.' Br., at 29–31.]

[17] Individual Defendants do not dispute the materiality of the alleged misrepresentation. *See* [Ind. Defs.' Br., at 7–9; Ind. Defs.' Reply Br., at 4–5.]

[18] Individual Defendants' reliance on the Integration Clause is mystifying given their claim and accompanying argument that no extrinsic misrepresentations are at issue. [Ind. Defs.' Br., at 7–8]; *see Cap. Health Sys., Inc. v. Symmetry Workforce Sols., LLC*, No. 24-CV-00202-ESK-MJS, 2025 WL 1554256, at *4 (D.N.J. June 2, 2025) (internal citation omitted) (emphasis added) ("[W]here a contract contains an integration clause, the parol evidence rule bars the introduction of evidence of *extrinsic* negotiations or agreements to supplement or vary its terms."). To the extent Plaintiff relies on extrinsic evidence for his fraud claim, Individual Defendants fail to edify the Court on why the well-settled fraudulent inducement exception to integration clauses does not apply here. *See id.*; [Ind. Defs.' Br., at 8–9.] A talismanic

[Ind. Defs.' Br., at 7–8.]  With respect to whether Plaintiff intended to do business with DHI and not DHIS—understood here as Plaintiff's reasonable reliance on DHIS's corporate personhood—the Court has already reviewed the parties' cited pre-contractual conduct and found, at best, a dispute of material fact.  *See supra*, at 11–12.  What is injected into the fraud claim is Individual Defendants' reliance on Plaintiff's *post*-contractual conduct which allegedly indisputably demonstrates their lack of intent to defraud him.  [Ind. Defs.' Br., at 10.]  Although there is undisputed record evidence from which a rational factfinder could conclude that DHI was the operative entity up to May 2009, *see* [Ind. Defs.' SOMF, at ¶¶ 39 (quoting Ex. 12), 41 (quoting Ex. 14), 53 (citing Ex. 19); Pl.'s SOMF, at ¶¶ 39, 41, 53], an email exchange between Plaintiff and Individual Defendant Nichols casts genuine factual doubt.

On May 29, 2009, Plaintiff emailed Individual Defendant Nichols for "bank statements for DHIS," to which he responded, "DHIS does not currently exist as a separate entity.  To protect you, and to avoid confusion I believe that either 1) DHIS needs to be created or 2) a new contract signed with DHI."  [Ind. Defs.' SOMF, at ¶¶ 56–57 (quoting Ex. 22, at 2).]  However, Individual Defendants concede that "no new contract was ever presented to Plaintiff for signature", [Ind. Defs.' SOMF, at ¶ 58; Pl.'s SOMF, at ¶ 59 (quoting Ex. 51, at ¶ 11)], which Plaintiff claims left him "with the impression that DHIS … was created as an entity," [Pl.'s SOMF, at ¶ 59 (quoting Ex. 51, at ¶ 11)].  Furthermore, Individual Defendant Nichols arguably signed the September 2009 Termination Letter on behalf of DHIS and unequivocally negotiated and executed a subsequent affiliated Advance Agreement with

---

incantation of the Integration Clause, especially one that appears to misunderstand its very nature, does not provide relief.

Plaintiff on DHIS's behalf. [Ind. Defs.' SOMF, at ¶¶ 62–63 (citing Ex. 26), 83–87 (citing Exs. 27–31); Pl.'s SOMF, at ¶¶ 62–63 (citing Docket No. 19-5; Ex. 26).] And, as established, there is no dispute that either Individual Defendant ever legally incorporated DHIS. *See supra*, at 13.

The parties carry on this tango with relatively equal measure up to June 2013 where, even then, Plaintiff emailed Individual Defendant Nichols for an explanation between DHIS and DHIS LLC—the entity formed from the reorganization of CSI and DHI. [Ind. Defs.' SOMF at ¶¶ 95, 110 (citing Ex. 40).] After review of the summary judgment evidence, the bottom line is this: there is a self-evident factual dispute as to whether Individual Defendants intended for Plaintiff to rely on the supposed corporate existence of DHIS to ultimately deprive him of 15% of a future sale. It is for the jury, not the Court, to decide this factual dispute.

### E. Damages

Damages are a fundamental element of any breach-of-contract claim. *See LM Ins. Corp.*, 2025 WL 3451333, at *4 (quoting *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)). The parties agree that Plaintiff's potential damages arising from his 15%-entitlement must be offset by the commission payments he continues to receive. [Ind. Defs.' Br., at 34; Pl.'s Opp. Br., at 19.] In turn, Individual Defendants argue that Plaintiff has already received more in commission payments than his would-be 15% share of a "sale". [Ind. Defs.' Br., at 35.] The issue with this is that it is premised on the Court finding that the relevant "sale" was the 2012 transaction for $5 million and not the 2014 and 2016 "sales" to TransUnion totaling

about $62.3 million,[19] for which Plaintiff argues he is entitled to approximately $10 million, far outpacing his disputed $2.04 or $2.3 million received in commission payments.[20]  [Ind. Defs.' Br., at 34–35; Pl.'s Opp. Br., at 18–19.]

Turning to the fraudulent inducement claim, Individual Defendants argue that Plaintiff's 15%-entitlement "is wholly unrelated to the alleged fraud … and is simply a contract claim against the corporate entity."  [Ind. Defs.' Br., at 13.]  This is effectively a repackaging of the economic loss doctrine which the Court rejected above.  *See supra*, at 14–16.  Individual Defendants also once again do not account for Plaintiff's request for punitive damages, which are generally unrecoverable in contract.  [Am. Compl., at 33; Ind. Defs.' Br., at 12–13; Ind. Defs.' Reply Br., at 6–7]; *Heartland Payment Sys., LLC*, 2020 WL 13580941, at *5.  Under either theory of recovery, there are live disputes of material fact preventing entry of summary judgment on the basis of damages.

## VI.    CONCLUSION

For the foregoing reasons, Individual Defendants' Motion for Summary Judgment will be **DENIED.**  The Court intends to **SCHEDULE** this matter for **TRIAL** upon submission of the Final Pre-Trial Order.  An accompanying Order shall issue.

<u>**December 23, 2025**</u>                          <u>**/s/Renée Marie Bumb**</u>
Date                                                  RENÉE MARIE BUMB
                                                      Chief United States District Judge

---

[19] There is an apparent dispute over the value of the 2016 transaction, thus the overall amount of TransUnion's acquisition. [Ind. Defs.' SOMF, at ¶¶ 145–46. Pl.'s Suppl. SOMF, at ¶ 45.] The Court's review of the damages as they relate to the pending Motion do not require resolution of this difference.

[20] The parties also quarrel over the appropriate allocation of damages in light of the various transactions and lines of business involved, but the Court, heeding Individual Defendants' directive, "need not determine what the appropriate allocation would be" in light of the factual disputes presented. [Ind. Defs.' Br., at 35.]